# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| Laura M. Tanner, | § | |
| Plaintiff, | § | |
| | § | CASE NO. 5:22-cv-347 |
| | § | |
| v. | § | |
| | § | |
| Experian Information Solutions, Inc.; | § | |
| TransUnion, LLC; World Finance | § | |
| Corporation LLC; 1st Franklin | § | |
| Corporation; and DOES 1 through 100 | § | |
| inclusive, | § | |
| | § | |
| Defendants. | § | |

COMES NOW Plaintiff **LAURA M. TANNER** ("Plaintiff"), an individual, based on information and belief, to allege as follows:

## INTRODUCTION

1.      This case arises under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681s-2(b), 1681e(b), 1681i(a)(2)(A), 1681i(a)(4), and 1681i(a)(5)(A). Plaintiff seeks redress for the unlawful and deceptive practices committed by the Defendants in connection with their inaccurate, misleading, or incomplete reporting of Plaintiff's debt.

2.      Defendant 1st Franklin Corporation ("1st Franklin") is not reporting the Plaintiff's account accurately as discharged in bankruptcy.

3.      Defendant World Finance Corporation LLC ("World Finance") is not reporting Plaintiff's account accurately as a single tradeline.

4.      The United States Congress has found the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system and unfair credit reporting methods undermine the public confidence that is essential to the continued functioning of the banking system.

5.      A pervasive and fundamental misunderstanding presently thrives in the United States regarding the long-term impact that filing a consumer bankruptcy has on the consumer's creditworthiness. Specifically, consumers tend to believe that since a bankruptcy can be reported

on their credit report for ten (10) years, their creditworthiness will be ruined for the same length of time. This is not true.

6.     The *majority* of consumer debtors file a consumer bankruptcy to *raise* their FICO Score and remedy their poor creditworthiness.

7.     In fact, it is possible for consumer debtors to obtain a 700 FICO Score as soon as twelve (12) months from filing a consumer bankruptcy (Chapter 7 or Chapter 13).

8.     Creditors and lending institutions are aware of the misconception that filing a consumer bankruptcy destroys the consumer's creditworthiness of ten (10) years; however, to perpetrate this bankruptcy myth, creditors intentionally and routinely ignore both industry standards and FCRA requirements for accurately reporting bankruptcies, as well as the debts included in those bankruptcies, to keep consumers' credit scores low and their interest rates high.

9.     Creditors know that deviating from recognized credit reporting standards and FCRA requirements will make it difficult for consumers to raise their credit scores and improve their creditworthiness.

10.     This was not the intent of Congress when it enacted the Fair Credit Reporting Act and the Bankruptcy Abuse Prevention and Consumer Protection Act.

## JURISDICTION & VENUE

11.     Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

12.     This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, 1367, and 15 U.S.C. § 1681.

13.     This venue is proper pursuant to 28 U.S.C. § 1391(b)(1).

14.     Plaintiff alleges that, for purposes of establishing residency under 28 U.S.C. § 1391(b)(1), each of the named Defendants conducts sufficient business within the forum state and this Court has personal jurisdiction over each Defendant under 28 U.S.C. §§ 1391(c)(2) and 1391(d).

## GENERAL ALLEGATIONS

15.     Plaintiff alleges that the 1st Franklin account was included in her Chapter 7 bankruptcy filing in that the debt occurred pre-petition and was subsequently discharged.

16.     Despite the fact the account was discharged, 1st Franklin is reporting the account with a past due payment status, which is patently incorrect and misleading.

17.     1ˢᵗ Franklin is not reporting the fact the debt was discharged anywhere on Plaintiff's TransUnion credit report. This is patently incorrect and misleading as it appears the debt was not discharged.

18.     Plaintiff alleges that it is patently incorrect and misleading for a debt which was discharged to be reported on a credit report with a past due payment status as this reporting makes it appear as if the debt was not discharged in bankruptcy.

19.     Plaintiff alleges that on or about December 12, 2019, she opened a single account with World Finance. Plaintiff alleges that this account was included in her Chapter 7 bankruptcy filing in that the debt occurred pre-petition and was subsequently discharged.

20.     Plaintiff alleges that World Finance is reporting Plaintiff's single account as two separate tradelines on Plaintiff's Experian credit report, which is patently incorrect.

21.     Further, as both tradelines are reporting as discharged in bankruptcy, it is misleading as it appears she had twice as many accounts discharged with World Finance than she actually did.

22.     Plaintiff alleges that it is patently incorrect and misleading for a single account to report as two tradelines.

23.     Plaintiff alleges that each and every Defendant is familiar with FCRA requirements and subscribes thereto.

24.     Plaintiff alleges that each and every Defendant understands that deviation from the FCRA requirements or credit reporting industry standards can, and often does, result in the denial of credit, higher interest rates, and prompts a negative inference that would not be drawn if the data were reported in accordance with the recognized standards.

25.     Plaintiff alleges that all of Defendants' actions alleged herein were committed knowingly, intentionally, and in reckless disregard of the unambiguous meaning of the FCRA, regulatory guidelines on accurate reporting, and credit reporting industry standards to purposefully undermine Plaintiff's ability to repair her Credit Score.

26.     In the alternative, Plaintiff alleges that each and every Defendants' actions were the result of negligent policies, procedures, and an objectively unreasonable interpretation of the FCRA, all which inevitably led to inaccurate, misleading, or incomplete credit reporting.

## FACTUAL BACKGROUND

27.     Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.     FICO, Inc.**

28.     FICO is a leading analytics software company with its principal headquarters in San Jose, California. FICO has over 130 patents related to their analytics and decision management technology and regularly uses mathematical algorithms to predict consumer behavior, including credit risk.

29.     The FICO Score has become the standard measure of consumer credit risk in the United States and is used in ninety percent (90%) of lending decisions. [1]

30.     A FICO Score consists of a three-digit number summarizing a consumer's credit risk or likelihood to repay a loan. FICO periodically updates its scoring models resulting in multiple FICO Score versions.

31.     Base FICO Scores range from 300 to 850, while industry specific FICO Scores range from 250-900. A higher FICO Score demonstrates lower credit risk or less likelihood of default.

32.     Different lenders use different versions of FICO Scores when evaluating a consumer's creditworthiness.

33.     There are twenty-eight (28) FICO Scores that are commonly used by lenders.

34.     A consumer's FICO Score is calculated based solely on information in consumer credit reports maintained at credit reporting agencies ("CRAs").

35.     The three largest CRAs are Experian Information Solutions, Inc. ("Experian"); Equifax Information Services, LLC ("Equifax"); and TransUnion, LLC ("TransUnion").

36.     FICO does not control what information is provided on a consumer's credit report. Instead, the scoring models, or algorithms, are based on the premise that the information provided by the CRAs is accurate and complies with both the FCRA requirements and credit reporting industry standards.

---

[1] While there are other credit scoring models, it is well established that FICO Score is by far the most widely used by lenders, employers, insurance companies, and lessors. *See https://www.myfico.com* (a website created and operated by Fair Isaac Corporation ("FICO"), "the company that invented the FICO credit score").

37.     There are five (5) key factors that a FICO Score considers: (1) payment history; (2) amount of debt; (3) length of credit history; (4) new credit; and (5) credit mix.

38.     Each of the five (5) factors is weighted differently by FICO.

39.     In other words, thirty-five percent (35%) of a consumer's FICO Score relates to payment history, thirty percent (30%) relates to the amount of debt, fifteen percent (15%) relates to the length of credit history, ten percent (10%) relates to new credit, and the final ten percent (10%) relates to a consumer's credit mix, which is the different types of debts reported.

40.     Payment history refers to whether a consumer has paid their bills in the past, on time, late, or missed payments. The more severe, recent, or frequent the late payment information, the greater the impact on a FICO Score. Public record items, such as bankruptcy, foreclosure, judgments, and wage garnishments are also considered part of a consumer's payment history.

41.     In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently this occurred, and how many delinquent accounts exist.

42.     Once a delinquent account has been remedied, the longer the account stays current the more a consumer's FICO Score should increase.

43.     FICO Scores are entirely dependent upon information provided by data furnishers ("DFs"), such as banks and other financial institutions, to CRAs.

44.     A FICO Score is a summary of your credit report. In simple terms, the FICO Score is calculated by taking the five (5) factors (payment history, amount of debt, length of credit history, new credit, and credit mix) for each account in a credit report and calculating a three digit number for lenders to review. "When you apply for credit, lenders need a fast and consistent way to decide whether or not to loan you money." *See* https://www.myfico.com/credit-education/what-is-a-fico-score. If a lender or employer did look past the FICO Score into a consumer's reports, chances are they either do not understand the tradeline meanings themselves, or, if they do and realize something appears incorrect, they are incapable of recalculating the complex mathematical algorithms in a FICO Score to take the found error into consideration. Therefore, most lenders and employers do not review individual accounts, just a consumer's FICO Score (or average of FICO Scores) in order to make "quicker decisions". *See id*.

45.     Some lenders also use internal scoring models. In these instances, the lenders attempt to produce their own "FICO Score" based upon their internal credit scorecard models. These models are, similar to FICO, based upon algorithms, business rules, codes, etc. and take information reported in the credit reports and assign weights to them in order to assess risk and make determinations as to consumer's creditworthiness. FICO Scores and the scores based off internal models being collectively referred to as "Credit Score".

**B.      e-OSCAR**

46.     e-OSCAR is the web-based system developed by Experian, Equifax, TransUnion, and Innovis that enables DFs and CRAs to create and respond to consumer credit disputes.

47.     When a consumer sends a dispute letter to a CRA, the CRA then sends an automated credit dispute verification ("ACDV") via e-OSCAR to the appropriate DF.

48.     The ACDV contains codes next to certain data fields associated with a credit file.

49.     When a data furnisher reports on a consumer's account as part of its regular reporting, it sends a regular monthly transmission to each CRA.

50.     When a data furnisher reports on a consumer's account outside of its regular monthly transmission, it sends an automated universal dataform ("AUD") to each CRA.

51.     For clarification, an AUD, or other regular transmission, is sent when the data furnisher initiates reporting on a consumer's account (e.g., opening an account, updating the account each month, closing an account, etc.), whereas an ACDV is how a data furnisher receives a dispute request from the CRAs and how it updates reporting back to the CRAs after its investigation of the matter.

**C.      Bankruptcy Credit Reporting Industry Standards & Consumer Information Indicator**

52.     When a consumer files bankruptcy, certain credit reporting industry standards exist.

53.     Certain data is regularly expected and calculated by FICO when determining a consumer's creditworthiness.

54.     The Consumer Information Indicator ("CII") is a critical field that indicates a special condition that applies to a specific consumer.

55.     It is the credit reporting industry standard to report a very specific CII upon the filing of a consumer bankruptcy.

56.     The CII Code "E" denotes that a Chapter 7 bankruptcy has been discharged.

57. The CII field is a critical field for consumers as it directly relates and impacts a consumer's creditworthiness.

58. The lack of a CII reported makes it appear that a consumer has not addressed outstanding debt obligations through the bankruptcy process.

59. Furthermore, the lack of a CII reported suggests that creditors are free to collect against a consumer as an individual, or that no stay exists to prevent in personam collection activity.

60. Failure to report the correct CII indicator will prompt those making credit decisions to draw a more negative inference than if the appropriate CII indicator were reported.

61. The FCRA permits a bankruptcy to be reported for ten (10) years from the date the bankruptcy was filed.

62. A consumer's FICO Score is directly related to the date on which a petition is filed and acknowledged.

63. The bankruptcy's impact on a consumer's FICO Score lessens with the passage of time.

64. Accordingly, the failure to reference the bankruptcy filing (CII field) and/or the correct petition date results in a lower FICO Score, which in turn causes credit decision makers to draw a more negative inference regarding a consumer's creditworthiness.

**D.     Plaintiff Filed Bankruptcy and Received a Discharge**

65. Plaintiff filed a voluntary petition for Chapter 7 bankruptcy on February 3, 2020, in order to repair her creditworthiness and Credit Score.

66. The Chapter 7 Trustee entered its report of No Distribution (no asset case) on May 4, 2020.

67. Plaintiff's bankruptcy was discharged on June 24, 2020.

**E.     Plaintiff's Credit Report Contains Inaccurate Adverse Tradelines, which Plaintiff Disputed to no Avail**

68. On June 1, 2021, Plaintiff ordered an Experian credit report and a TransUnion credit report to ensure proper reporting by Plaintiff's creditors (the "June 1 Credit Reports").

69. Plaintiff noticed adverse tradelines in her June 1 Credit Reports, reporting inaccurate, misleading, or incomplete information that did not comply with FCRA standards.

70.    Plaintiff then disputed the inaccurate tradeline regarding the 1st Franklin account via certified mail to TransUnion on July 19, 2021 (the "First Dispute Letter").

71.    Plaintiff's First Dispute Letter specifically put 1st Franklin on notice that Plaintiff filed for bankruptcy and received a discharge and that the reporting should be updated.

72.    On September 13, 2021, Plaintiff ordered a second Experian credit report and TransUnion credit report to determine if her accounts were updated (the "September 13 Credit Reports").

73.    Plaintiff then disputed the inaccurate tradeline regarding the World Finance account via certified mail to Experian on or about February 1, 2022 (the "Second Dispute Letter").

74.    Plaintiff's Second Dispute Letter put World Finance on notice that Plaintiff's single account was being reported as two tradelines on her credit report and that the duplicate reporting should be removed.

75.    Plaintiff's First Dispute Letter and Second Dispute Letter will collectively be referred to as the "Dispute Letters".

76.    Plaintiff's Dispute Letters also detailed what was perceived to be problematic about the accounts, addressing each tradeline individually.

77.    Plaintiff requested that any derogatory reporting be updated to ensure accuracy and completeness of the accounts as required by the FCRA.

78.    Plaintiff is informed and believes that TransUnion received Plaintiff's First Dispute Letter and, in response, sent Plaintiff's dispute to 1st Franklin, as the data furnisher, via an ACDV through e-OSCAR.

79.    Plaintiff is informed and believes that Experian received Plaintiff's Second Dispute Letter and, in response, sent Plaintiff's dispute to World Finance, as the data furnisher, via an ACDV through e-OSCAR.

80.    On March 18, 2022, Plaintiff ordered a third Experian credit report and TransUnion credit report to determine if her accounts were updated.

a.    **Inaccuracy – 1st Franklin**

81.    Despite actual knowledge, 1st Franklin continued to report Plaintiff's account, beginning in 798301XXXX, to TransUnion with a payment status of "30 days past due," and without notice of the bankruptcy discharge. This tradeline is patently inaccurate as the account was discharged in bankruptcy.

82. Plaintiff alleges that 1st Franklin did not investigate whether Plaintiff filed for bankruptcy.

83. 1st Franklin did not update the tradeline to reflect that Plaintiff obtained a discharge in bankruptcy.

84. TransUnion provided notice to 1st Franklin that Plaintiff was disputing the inaccurate and misleading information, but 1st Franklin failed to conduct a reasonable investigation of the information as required by the FCRA.

85. Based upon Plaintiff's dispute, 1st Franklin should have known that Plaintiff received a discharged in her bankruptcy proceedings.

86. The most basic investigation would include a simple review of its reporting in light of the fact that Plaintiff filed a Chapter 7 bankruptcy and received her discharge in order to determine if the reporting complies with the maximum possible accuracy and completeness standard of the FCRA.

87. Plaintiff alleges that 1st Franklin did not review if its reporting complied with the unambiguous language of the FCRA, regulatory guidelines on accurate reporting under the FCRA, or its own internal records concerning Plaintiff's account.

88. If 1st Franklin reviewed such standards, or its own internal records regarding Plaintiff's account, 1st Franklin would have seen that its reporting was not in compliance and was therefore patently inaccurate or incomplete.

89. 1st Franklin should have updated the tradeline CII to Code "E" to reflect the debt was discharged in Plaintiff's Chapter 7 bankruptcy and removed the past due payment status.

90. By continuing to report Plaintiff's account to TransUnion as described in paragraph 81, it incorrectly appears to third parties viewing Plaintiff's credit report that the account was not discharged in bankruptcy, which in inaccurate.

91. Further, as this inaccurate reporting is being used to calculate Plaintiff's Credit Score, the credit score alone being what most lenders and employers use to determine Plaintiff's creditworthiness, it is misleading in such a way as to adversely affect credit decisions.

92. As payment history (including payment status) makes up thirty-five percent (35%) of a consumer's FICO Score, and as most lenders approve or deny credit based on a consumer's credit score (as opposed to poring through each tradeline of every account listed to obtain context),

the incorrect payment status reported by 1st Franklin on the account is lowering Plaintiff's Credit Score, which adversely affects Plaintiff's ability to obtain credit.

93. The lack of investigation and reporting of inaccurate and incomplete information by 1St Franklin is unreasonable.

**b.  Inaccuracy – World Finance**

94. Despite actual knowledge, World Finance continued to report Plaintiff's single account, beginning in 950896XXXX to Experian as two separate accounts, each with a payment status of "Discharged through bankruptcy Chapter 7, 11, or 12". This is patently incorrect as this was a single account which was discharged, not two accounts.

95. Plaintiff alleges that World Finance did not investigate whether Plaintiff's account was being reported twice.

96. World Finance did not remove the duplicate tradeline on Plaintiff's credit report.

97. Experian provided notice to World Finance that Plaintiff was disputing the inaccurate and misleading information, but World Finance failed to conduct a reasonable investigation of the information as required by the FCRA.

98. The most basic investigation would include a simple review of the fact there is only one account compared to its reporting of two accounts in order to determine if it complies with the maximum possible accuracy and completeness standard of the FCRA.

99. Plaintiff alleges that World Finance did not review if its reporting complied with the unambiguous language of the FCRA, regulatory guidelines on accurate reporting under the FCRA, or its own internal records concerning Plaintiff's account.

100. If World Finance reviewed such standards, or its own internal records regarding Plaintiff's account, World Finance would have seen that its reporting was not in compliance and was therefore inaccurate or incomplete.

101. By reporting Plaintiff's account as described in paragraph 94, it appears to third parties viewing Plaintiff's credit report that Plaintiff's had two World Finance accounts discharged, which is patently incorrect and misleading.

102. Further, as World Finance's inaccurate reporting is being used to calculate Plaintiff's Credit Score, the credit score alone being what most lenders and employers use to determine Plaintiff's creditworthiness, it is misleading in such a way as to adversely affect credit decisions.

103.     The lack of investigation and reporting of inaccurate and incomplete information by World Finance is unreasonable.

**Damages**

104.     Plaintiff pulled the credit reports at issue at a cost for access to the reports, after the dispute process, specifically for the sole purpose of verifying that the inaccuracies were fixed.

105.     As a result of the incorrect reporting, Plaintiff has incurred out-of-pocket expenses, and has also suffered emotional harm, physical sickness, and excessive stress resulting in doubt as to the effectiveness of the Bankruptcy Code, the Fair Credit Reporting Act, and the power of this Court to preserve and perpetuate a fresh start as intended by Congress.

106.     Plaintiff has been denied credit and is unable to rebuild her credit based on the inaccurate reporting by 1st Franklin. Plaintiff's diminished creditworthiness, resulting from 1st Franklin's inaccurate reporting, has caused her to abandon her intentions to apply for certain credit.

107.     1st Franklin's actions, as alleged herein, are each in direct violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681.

108.     Plaintiff has been denied credit and is unable to rebuild her credit based on the inaccurate reporting by World Finance. Plaintiff's diminished creditworthiness, resulting from World Finance's inaccurate reporting, has caused her to abandon her intentions to apply for certain credit.

109.     World Finance's actions, as alleged herein, are each in direct violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681.

## FIRST CAUSE OF ACTION

### (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681e(b))

### (Against Defendants and Does 1-100)

110.     Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.     Experian and TransUnion Each Failed to Assure Credit Reporting Accuracy**

111.     Experian and TransUnion (collectively, the "CRA Defendants") each violated 15 U.S.C. § 1681e(b) by failing to establish and/or follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's credit reports and the credit files each CRA Defendant published and maintained concerning Plaintiff.

112.    Had Experian maintained reasonable procedures to assure maximum accuracy, it would have never reported the World Finance account as described herein.

113.    Experian knew, or should have known, (1) that there was a single World Finance account opened December 12, 2019, with account number 950896XXXX, for an amount of $1,319, and (2) that as all of the information on the two tradelines was identical, only a single World Finance account should be reported. Further, Experian knew, or should have known, that this inaccurate and incomplete tradeline does not reflect *maximum possible accuracy and completeness* as required by the FCRA.

114.    Had TransUnion maintained reasonable procedures to assure maximum accuracy, it would have never reported the 1st Franklin account as described herein.

115.    TransUnion knew, or should have known, (1) that the 1st Franklin account was discharged in bankruptcy, and (2) that the account should not have been reported with a payment status of "30 days past due" as the debt was discharged. Further, TransUnion knew, or should have known, that this inaccurate and incomplete tradeline does not reflect *maximum possible accuracy and completeness* as required by the FCRA.

116.    Congress specifically recognized the "elaborate mechanism developed for investigating and evaluating credit worthiness, credit standing, credit capacity, character, and general reputation of consumers." *Nayab v. Capital One Bank (USA), NA*, 942 F. 3d 480, 492 (9th Cir. 2019). The investigation and evaluation of Plaintiff's credit worthiness, credit standing, credit capacity, character and general reputation as a consumer are all damaged by the inaccurate reporting the CRA Defendant's allowed.

117.    As a result of the CRA Defendants' violations of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including but not limited to: damage to reputation, embarrassment, humiliation, dissemination of inaccurate information, diminished credit, and other mental and emotional distress.

**B.    Willful Violations**

118.    The CRA Defendants' violations, as described herein, were willful; specifically, the CRA Defendants have intentionally and purposefully set up a system where inaccuracies are not only probable, but inevitable.

119.    The CRA Defendants regularly, as a policy, ignore disputes by consumers and fail to perform even a basic investigation regarding the disputes. Additionally, the CRA Defendants regularly fail to forward disputes to data furnishers, thereby frustrating the entire dispute process.

120.    To the extent the CRA Defendants do send consumer disputes, they send these disputes to employees who do not live within the continental United States to hide or subvert a consumer's liability to confront the individual(s) directly responsible for approving accurate reporting.

121.    The CRA Defendants' respective employees receive little to no training concerning how to accurately report consumer debt.

122.    Instead, the CRA Defendants' respective employees are instructed to parrot whatever information a data furnisher provides regardless of whether the information is accurate.

123.    The CRA Defendants' respective employees are regularly expected to review and approve over ninety (90) disputes per day, rendering less than five (5) minutes to review, investigate, and respond to each dispute received.

124.    The CRA Defendants have intentionally set up this system in order to undermine, hide, and otherwise frustrate consumers' ability to properly dispute and correct credit reports.

125.    As a result of the CRA Defendants' violations of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, dissemination of inaccurate information, diminished credit, and other mental and emotional distress.

126.    The CRA Defendants' violations were willful, rendering each individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

127.    In the alternative, Experian was negligent, which entitles Plaintiff to recover under 15 U.S.C. § 1681o.

128.    In the alternative, TransUnion was negligent, which entitles Plaintiff to recover under 15 U.S.C. § 1681o.

129.    Plaintiff is entitled to recover actual damages, statutory damages, costs, and attorneys' fees from the CRA Defendants in an amount to be determined by this Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## SECOND CAUSE OF ACTION

## (Violation of Fair Credit Reporting Act 15 U.S.C. §§ 1681s-2(b) and 1681i(a)(1))

## (Against Defendants and Does 1-100)

130.    Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.    1st Franklin Failed to Reinvestigate Following Plaintiff's Dispute**

131.    Pursuant to 15 U.S.C. § 1681s-2(b), data furnishers are prohibited from providing any information relating to a consumer to any CRA if it knows, or has reasonable cause to believe, that the information is inaccurate or misleading and requires data furnishers to update and/or correct inaccurate information after a CRA notifies it of a consumer dispute.

132.    After receiving the First Dispute Letter, 1st Franklin did not correct the payment status with TransUnion. Instead, 1st Franklin verified and re-reported the payment status as "30 days past due" via ACDV to TransUnion. Further, 1st Franklin did not report the correct CII to accurately reflect that the debt was discharged.

133.    The payment status reported in an AUD, monthly transmission, or ACDV represents the status of the account at the time of sending the AUD, monthly transmission, or ACDV, and is not a historical contractual item (i.e., monthly payment, highest balance, payment history, etc.). Therefore, even in the event the account was previously past due, if at all, it has no bearing on its pay status after the account was discharged in bankruptcy.

134.    1st Franklin violated 15 U.S.C. § 1681s-2(b) by either failing to conduct an investigation or failing to conduct a reasonable investigation, and re-reporting misleading and inaccurate account information.

135.    TransUnion provided notice to 1st Franklin that Plaintiff was disputing the inaccurate and misleading information; however, 1st Franklin either failed to conduct any investigation or failed to conduct a reasonable investigation as required by the FCRA.

136.    Based on Plaintiff's dispute, 1st Franklin should have known its account was discharged in bankruptcy and ceased its inaccurate reporting.

137.    Reporting a discharged debt with a past due payment status is patently incorrect.

138.    In addition, this inaccurate reporting also adversely affects credit decisions. This inaccurately reported account is being considered when calculating Plaintiff's Credit Score. Most lenders, employers, and other individuals who access a consumer's credit report approve or deny

credit or employment based upon the reported credit score and do not take the time to look through each tradeline of every account listed to obtain context. Therefore, 1st Franklin's reporting as described herein has a direct adverse effect on Plaintiff's Credit Score and her ability to rebuild her Credit Score and obtain new credit.

139.    The lack of investigation by 1st Franklin, as required by the FCRA, is unreasonable.

**B.    World Finance Failed to Reinvestigate Following Plaintiff's Dispute**

140.    Pursuant to 15 U.S.C. § 1681s-2(b), data furnishers are prohibited from providing any information relating to a consumer to any CRA if it knows, or has reasonable cause to believe, that the information is inaccurate or misleading and requires data furnishers to update and/or correct inaccurate information after a CRA notifies it of a consumer dispute.

141.    Despite knowing Plaintiff only had one account opened on December 12, 2019, World Finance sent an AUD or monthly transmission to Experian reporting the account twice.

142.    After receiving notice of the bankruptcy discharge, World Finance sent and AUD or monthly transmission to Experian reporting both tradelines with a payment status as discharged or included in bankruptcy.

143.    After receiving the Second Dispute Letter, World Finance did not delete the duplicate tradeline. Instead, World Finance verified and re-reported the payment status as discharged in bankruptcy on both tradelines via ACDV to Experian.

144.    World Finance violated 15 U.S.C. § 1681s-2(b) by either failing to conduct an investigation or failing to conduct a reasonable investigation, and re-reporting misleading and inaccurate account information.

145.    Experian provided notice to World Finance that Plaintiff was disputing the inaccurate and misleading information; however, World Finance either failed to conduct any investigation or failed to conduct a reasonable investigation as required by the FCRA.

146.    Based on Plaintiff's dispute and review of its internal records on the account, World Finance should have known there was only a single account opened December 12, 2019, with account number 950896XXXX, for an amount of $1,319, and ceased its inaccurate reporting.

147.    Reporting a single account as two tradelines is patently incorrect.

148.    In addition, this incorrect reporting also adversely affects credit decisions. The more discharged debts that are reported, the greater the impact to a consumer's creditworthiness. Thus, reporting a single account which was discharged as if it were two accounts which were

discharged, negatively impacts a consumer's creditworthiness. Therefore, World Finance's reporting as described herein has a direct adverse effect on Plaintiff's Credit Score and her ability to rebuild her credit score and obtain new credit.

149. The lack of investigation by World Finance, as required by the FCRA, is unreasonable.

## C. Willful Violations

150. Plaintiff alleges that 1st Franklin and World Finance have reported based upon objectively unreasonable interpretations of the FCRA standards of credit reporting and regulatory guidelines on how to accurately report under the FCRA.

151. Plaintiff further alleges that 1st Franklin and World Finance have not properly trained those directly investigating disputes on the FCRA requirements or credit reporting industry standards and, as such, have developed reckless policies and procedures.

152. Plaintiff alleges that rather than train their employees on accurate credit reporting, FCRA requirements, and industry standards, 1st Franklin and World Finance's respective employees tasked with reviewing disputes are expected to confirm the information being reported as "accurate" instead of investigating the reporting.

153. In the alternative, 1st Franklin was negligent, which entitles Plaintiff to recover under 15 U.S.C. § 1681o.

154. In the alternative, World Finance was negligent, which entitles Plaintiff to recover under 15 U.S.C. § 1681o.

## D. The CRA Defendants Each Failed to Reinvestigate the Disputed Information in violation of 15 U.S.C. § 1681i(a)(1)

155. Pursuant to 15 U.S.C. § 1681i(a)(1), Experian was required to conduct a reasonable investigation and to delete any information that was not accurate after receiving notice of Plaintiff's dispute regarding the World Finance accounts.

156. Pursuant to 15 § U.S.C. 1681i(a)(1), TransUnion was required to conduct a reasonable investigation and to delete any information that was not accurate after receiving notice of Plaintiff's dispute regarding the 1st Franklin account.

157. Thus, the CRA Defendants failed to conduct a reasonable investigation and correct the misleading and/or inaccurate statements on the accounts within the statutory time frame.

158. The CRA Defendants are not passive entities bound to report whatever information a data furnisher provides.

159. Plaintiff alleges the CRA Defendants are readily familiar with FCRA requirements and credit reporting industry standards.

160. Based on the foregoing, Plaintiff alleges that the CRA Defendants can, and do, suppress inaccurate information from being reported when data furnishers provide inaccurate information.

161. The CRA Defendants can, and do, instruct data furnishers on how to properly report certain accounts from time to time upon request from a data furnisher.

162. Experian failed to conduct a reasonable investigation because any basic investigation would have uncovered that World Finance was reporting a single account multiple times.

163. Had Experian conducted a proper investigation, it could have suppressed the duplicate World Finance account on the credit report. However, Experian continued to report the account as described herein.

164. TransUnion failed to conduct a reasonable investigation because any basic investigation would have uncovered that 1st Franklin was not reporting its account at issue correctly.

165. Had TransUnion conducted a proper investigation, it could have closed or bookended the 1st Franklin debt by adding a notation on the credit report to show that the debt was in fact discharged in bankruptcy and removed the past due payment status. However, TransUnion continued to report the account as described herein.

166. The CRA Defendants, therefore, did not conduct even the most basic investigation regarding credit reporting industry standards, otherwise the aforementioned would have been uncovered.

167. In the alternative, Plaintiff alleges that Experian did not send an ACDV to World Finance to confirm accurate reporting on its accounts. Despite receiving the Second Dispute Letter providing notice of the inaccuracies, Experian did not delete or correct the tradelines or conduct an investigation.

168. In the alternative, Plaintiff alleges that TransUnion did not send an ACDV to 1st Franklin to confirm accurate reporting on its account. Despite receiving the First Dispute Letter

providing notice of the inaccuracies, TransUnion did not delete or correct the tradeline or conduct an investigation.

169. In the alternative, if the CRA Defendants deemed Plaintiff's Dispute Letters "frivolous or irrelevant" under 15 U.S.C. § 1681i(a)(3), the CRA Defendants each failed to notify Plaintiff of such determination as required by 15 U.S.C. § 1681i(a)(3)(B). As Plaintiff received no such notice from the CRA Defendants, Plaintiff alleges the CRA Defendants each deemed her Dispute Letters valid, and thus triggered its obligations under 15 U.S.C. § 1681i(a)(1) and (2)(A), for which the CRA Defendants did not comply.

## THIRD CAUSE OF ACTION
### (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(4))
### (Against Defendants and Does 1-100)

170. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.    The CRA Defendants Each Failed to Review and Consider all Relevant Information**

171. The CRA Defendants each violated 15 U.S.C. § 1681i(a)(4) by failing to review and consider all relevant information submitted by Plaintiff.

172. The CRA Defendants' violations of 15 U.S.C. § 1681i(a)(4) have caused Plaintiff to suffer actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

**B.    Willful Violations**

173. The CRA Defendants' violations were willful, rendering each individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

174. In the alternative, the CRA Defendants were each negligent in failing to review and consider all relevant information Plaintiff submitted, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

175. Plaintiff is entitled to recover actual damages, statutory damages, costs, and attorneys' fees from the CRA Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**FOURTH CAUSE OF ACTION**

**(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(5)(A))**

**(Against Defendants and Does 1-100)**

176.	Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.	The CRA Defendants Each Failed to Delete Disputed and Inaccurate Information**

177.	The CRA Defendants each violated 15 U.S.C. § 1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate items of information from Plaintiff's credit file or modify the item of information upon a lawful reinvestigation.

178.	The CRA Defendants' violations of 15 U.S.C. § 1681i(a)(5)(A) have resulted in Plaintiff suffering actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

**B.	Willful Violations**

179.	The CRA Defendants' violations were willful, rendering each individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

180.	In the alternative, the CRA Defendants were each negligent, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

181.	Plaintiff is entitled to recover actual damages, statutory damages, costs, and attorneys' fees from the CRA Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**PRAYER FOR RELIEF**

182.	WHEREFORE, Plaintiff prays for judgment as follows:

a.	For preliminary and permanent injunctive relief to stop Defendants from engaging in the conduct described above;

b.	Award statutory and actual damages pursuant to 15 U.S.C. § 1681n;

c.	Award punitive damages in order to deter further unlawful conduct pursuant to 15 U.S.C. § 1681n;

d.	Award attorneys' fees and costs of suit incurred herein pursuant to 15 U.S.C. §§ 1681n and 1681o;

e.	For determination by the Court that Defendants' policies and practices are unlawful and in willful violation of 15 U.S.C. § 1681n, *et seq*.; and

f.  For determination by the Court that Defendants' policies and practices are unlawful and in negligent violation of 15 U.S.C. § 1681o.

Respectfully submitted,

**SCHUMACHER LANE PLLC**

Dated: April 11, 2022

*/s/ Kyle Schumacher*
Kyle Schumacher
kyle@schumacherlane.com
P.O. Box 558
Spring Branch, TX 78070
503-482-8137 ph
210-783-1383 fax
Attorneys for Plaintiff

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial of this matter by jury.


**SCHUMACHER LANE PLLC**


Dated: April 11, 2022

*/s/ Kyle Schumacher*
Kyle Schumacher
Attorneys for Plaintiff